United States District Court
District of New Jersey

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Joseph A. Dickson |
| v. | : **CRIMINAL COMPLAINT** |
| JONG H. PARK,<br>  a/k/a "Rafa" and<br>JUNG Y. CHOI,<br>  a/k/a "Tina." | :<br>:<br>: Magistrate No. 12-6669 |

I, Giuliano Cristino, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. From in or about January 2010 through in or about June 2012, in the District of New Jersey, and elsewhere, defendants did:

>  knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity and/or to avoid transaction reporting requirements under federal law, conspired with each other and others to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, specifically the transfer, delivery, and other disposition of United States currency, involving the proceeds of specified unlawful activity, namely the distribution of controlled substances, contrary to Title 18, United States Code, 1956(a)(1)(B)(i) and (ii).

In violation of Title 18, United States Code, Section 1956(h).

Upon conviction of the offense set forth in this Complaint, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982, all property involved in such offense and all property traceable to such property, including but not limited to the real property located at 522 Closter Dock Road, Closter, New Jersey.

If any of the property described above, as a result of any act or omission of the defendants:
  a. cannot be located upon the exercise of due diligence;
  b. has been transferred or sold to, or deposited with, a third party;
  c. has been placed beyond the jurisdiction of the court;
  d. has been substantially diminished in value; or
  e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b).

I further state that I am a Special Agent with the Drug Enforcement Administration and that this complaint is based on the following facts:

SEE ATTACHMENT A

_____
Giuliano Cristino
Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

_____ at     Newark, New Jersey
July 6, 2012                              City and State

_____        _____
Hon. Joseph A. Dickson                 Signature of Judicial Officer
United States Magistrate Judge

# ATTACHMENT A

I, Giuliano Cristino, am a Special Agent with the Drug Enforcement Administration, and I am fully familiar with the facts set forth herein based on my own investigation and my conversations with other agents, and members of the law enforcement community and my review of their reports and of items of evidence. Where statements of others are related herein, they are related in substance and in part. Since this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. The descriptions of intercepted calls discussed below are based on summaries of the conversations prepared by law enforcement officers. In the descriptions, comments enclosed in parentheses are based upon my knowledge, training, and experience, as well as upon the results of the investigation to date. Based upon my investigation and discussions with other individuals involved in this investigation, as well as information obtained from other law enforcement officers, I have knowledge of the following facts:

## SUMMARY OF THE INVESTIGATION

1. Beginning in or about January 2010, the Drug Enforcement Administration and other law enforcement agencies began investigating the Salvador Moreno drug traffic organization (hereinafter, the "Moreno DTO"). The Moreno DTO is a United States based distribution organization for the Mexican Cartel La Familia. The investigation revealed that the Moreno DTO operates a heroin distribution cell in Boston, Massachusetts led by Francisco J. Cerda (hereinafter, "Cerda") and Toribio Medina (hereinafter, "Medina"). The distribution cell would receive kilogram quantities of heroin from the Moreno DTO and remit payment for and profits from the sale of narcotics to money laundering associates, such as JONG H. PARK (hereinafter, "PARK") and JUNG Y. CHOI (hereinafter, "CHOI").

2. The investigation to date has revealed that PARK and CHOI conduct their money laundering business at a residence at 522 Closter Dock Road, Closter, New Jersey (hereinafter, "522 Closter Dock Road"). (It is also the business address for "Beads House Inc.," a business owned by PARK and CHOI, and whose bank accounts are rife with structuring activity.) For example, in furtherance of this money laundering conspiracy, PARK and CHOI contacted money brokers working on behalf of the Moreno DTO for the purpose of retrieving drug proceeds in the form of bulk currency. After retrieving the bulk currency, PARK and CHOI then took the bulk currency to 522 Closter Dock Road. Over the next few days, PARK and CHOI deposited portions of the bulk currency into personal bank accounts and business bank accounts in the name of Beads House, Inc. These deposits were made in cash and structured in increments to avoid the legal reporting requirements or made in checks from coconspirators to conceal the true source of the money. PARK and CHOI next wire transferred the money to coconspirators in the United States, Mexico, South Korea, and China. PARK and CHOI charged a commission or fee to the Moreno DTO at the completion of each successful transaction.

**TRANSACTION #1**

*A.     On August 19, 2011, PARK retrieved $100,000 in drug proceeds from Medina.*

   3.   On or about August 11, 2011, an undercover officer ("UC-3") was contacted by an unidentified male (hereinafter, "UM-2") associated with the Moreno DTO for the purpose of having UC-3 launder a shipment believed to be $100,000 of drug proceeds being held in Boston, Massachusetts. To this end, UM-2 provided UC-3 with a telephone number associated with Cerda (hereinafter, the "Cerda Facility") to coordinate the pick-up and delivery of the drug proceeds. Due to a delay, UM-2 was forced to retain a new money laundering contact as is detailed below.

   4.   On August 18, 2011, telephone toll records reveal that a cellular telephone used by Medina (hereinafter, the "Medina Facility") contacted a cellular telephone used by PARK and CHOI (the "Target Facility #1"). At that time, investigators recognized the telephone number associated with Target Facility #1 from toll records from the Cerda Facility. Based on the investigation of Cerda's phone contacts and several structured deposits made by PARK into the bank account for Beads House Inc., investigators suspected PARK to be involved in money laundering activities.

   5.   On August 19, 2011, at approximately 8:00 a.m., investigators established physical surveillance at 116 Bradlee Street, Hyde Park, Massachusetts (hereinafter, "116 Bradlee Street") where Cerda and Medina were believed to reside, and where law enforcement believed Cerda and Medina stored drugs and drug proceeds. At approximately 9:26 a.m., the Medina Facility contacted Target Facility #1. This call lasted a little over two minutes. At approximately 9:46 a.m., another two-minute call was made from the Medina Facility to Target Facility #1. (I believe these calls were to arrange the delivery of drug proceeds from Medina to PARK that same day and to discuss a general meeting location. They would choose a location near the Palisades Parkway in Fort Lee, New Jersey).

   6.   At approximately 9:50 a.m., just a few minutes after the second call from Medina to Target Facility #1, agents observed Medina exit 116 Bradlee Street carrying a weighted white bag, enter his Trailblazer, and leave the area of 116 Bradlee Street. (This Trailblazer was previously used by Cerda and Medina to deliver $197,000 in drug proceeds to an undercover agent on July 21, 2011).

   7.   At approximately 11:25 a.m., agents located the Trailblazer parked along side of a Pilot Shell gas station in North Stonington, Connecticut. At approximately 11:32, agents observed Medina walk out of the gas station enter the Trailblazer. Medina was the sole occupant of the Trailblazer when he departed the gas station. Surveillance continued to follow Medina south on Interstate 95.

   8.   At approximately 3:00 p.m., surveillance revealed that the Trailblazer arrived in Fort Lee, New Jersey. Surveillance also observed the Trailblazer as it traveled along dead-end roads close to the Hudson River in Fort Lee, New Jersey. (I believe that Medina was performing counter-surveillance maneuvers in an attempt to detect law enforcement surveillance).

9. At approximately 3:07 p.m., the Medina Facility contacted the Target Facility #1. The call lasted for just over one minute. At approximately 3:14 p.m., the Medina Facility contacted the Target Facility #1. The call lasted for almost two minutes.

10. At approximately 3:15 p.m., agents observed PARK driving a white 2009 Lexus (hereinafter "the 2009 Lexus") registered in the name of CHOI facing north, across from 2339 Hudson Terrace, Fort Lee, New Jersey where Medina's Trailblazer was located. At approximately 3:28 p.m., the Target Facility #1 contacted the Medina Facility.

11. At approximately the same time, agents observed Medina exit the Trailblazer and walk towards the 2009 Lexus on the passenger side. Medina spoke with PARK briefly, and then entered the 2009 Lexus on the front passenger side. PARK then made a u-turn with the Lexus and pulled behind the Trailblazer.

12. Subsequently, Medina exited the 2009 Lexus and approached the Trailblazer. Agents then observed Medina reach into the backseat of the Trailblazer, from the driver's side, and remove a white bag. PARK exited the 2009 Lexus, and Medina then handed the white bag to PARK. PARK placed the white bag in the trunk of the 2009 Lexus.

13. Shortly thereafter, Medina left the area in the Trailblazer and PARK left the area in the Lexus. Agents conducting surveillance observed PARK travel north on the Palisades Interstate Parkway until he arrived at his residence at 522 Closter Dock Road at approximately 3:50 p.m. Agents then observed PARK exit the 2009 Lexus, while carrying the white gym bag and dialing on his cellular telephone. Telephone toll records reveal that the Target Facility #1 was used to contact the Medina Facility at the same time that PARK was observed by agents dialing on his cellular telephone. This call lasted for just thirty-two seconds. (Based on my training and experience, when a money launderer receives money from an associate, it is common for the money launderer to contact the associate again to confirm that the money launderer arrived safely at a stash house. Therefore, I believe this call concerned the laundering of drug proceeds). Medina did not follow PARK to 522 Closter Dock Road, but instead returned directly to Interstate 95 and drove back to 116 Bradlee Street.

14. At approximately 8:01 p.m., Cerda contacted the Medina Facility. During the ensuing conversation, which was recorded by law enforcement, Medina stated, "I'm here...arriving. I just passed the town where I used to live...I'll be there in about 40 minutes." (Cerda was checking on Medina to verify that Medina was returning to 116 Bradlee Street without incident, and Medina was reporting his progress and location to Cerda). In response, Cerda stated "Alright, then. I will wait for you here."

B. *PARK subsequently conducts structured deposits into a bank account for Beads House*

15. During the course of the following week, PARK made a series of deposits just under $10,000 that were structured to launder the proceeds by avoiding a reporting requirement.

16. On August 22, 2011, bank surveillance video cameras captured PARK conducting structured deposits of $9,900 and $8,900 in checks into Bank of America account number 3810-2419-0301 for Beads House, Inc.

5

17. On August 23, 2011, bank surveillance video cameras captured PARK conducting a structured deposit of $8,650 cash into Bank of America account number 3810-2419-0301 for Beads House, Inc.

18. On August 24, 2011, bank surveillance video cameras captured PARK conducting a structured deposit of $9,600 cash into Bank of America account number 3810-2419-0301 for Beads House, Inc.

19. On August 25, 2011, bank surveillance video cameras captured PARK conducting a structured deposit of $8,980.50 cash into Bank of America account number 3810-2419-0301 for Beads House, Inc.

20. On August 26, 2011, bank surveillance video cameras captured PARK conducting a structured deposit of $5,000 cash into Bank of America account number 3810-2419-0301 for Beads House, Inc.

21. From September 6, 2011 through September 29, 2011, bank records reveal 11 structured deposits in cash into Bank of America account number 3810-2419-0301 for Beads House, Inc. of at least $5,000 per transaction for a total of $108,130.

22. Based on my training and experience, and based on the pattern of activity used by Cerda and Medina for their respective money delivery to an undercover agent in July 2011, I believe Toribio Medina was delivering drug proceeds to PARK in order for PARK to launder them. This view is based, in part, on the fact that: (a) Medina drove about eight hours round-trip to make a brief hand-to-hand delivery to PARK on a side-street; (b) before meeting with PARK, Medina executed a series of counter-surveillance maneuvers; (c) Medina had made a similar shipment of drug proceeds to an undercover agent on July 21, 2011; and (d) PARK's structured cash deposits following his rendezvous with Medina.

## TRANSACTION #2

A.  *On November 8, 2011, CHOI retrieved $169,710 in drug proceeds from the Moreno DTO*

23. On November 8, 2011, at approximately 8:00 a.m., agents conducted surveillance in the vicinity of a hotel in Dorchester, MA. During that time, agents confirmed that Audel Hernandez ("Hernandez"), a member of the Moreno DTO, was a customer staying at the hotel.

24. At approximately 12:49 p.m., agents observed a white 2011 Lexus GX sport utility vehicle arrive in the hotel parking lot. The driver, later identified as CHOI, and a female passenger exited the vehicle and entered the front entrance of the hotel. Inside the lobby of the hotel, CHOI was observed speaking on her cellular telephone and then meet with Hernandez. CHOI shook hands with Hernandez and all three individuals exited the hotel. At that time, Hernandez was carrying two bags: a blue bag over his left shoulder, which appeared to be full and weighted, and a smaller black computer bag.

25. At approximately 12:58 p.m., Hernandez, the unknown female, and CHOI entered the 2011 Lexus GX. Each remained seated for several minutes.

26. At approximately 1:07 p.m., the 2011 Lexus GX departed the area and drove to a store, whereupon Hernandez exited the vehicle, carrying the blue bag, which appeared less weighted.

27. On November 16, 2011, at approximately 12:22 p.m., CHOI received an incoming call over Target Facility #2, a phone used by both PARK and CHOI., and spoke with PARK. During the ensuing conversation, which was recorded by law enforcement, PARK stated, "Wait. Tell me." (PARK was asking CHOI how much money in drug proceeds she had retrieved from the trip to Massachusetts on November 8, 2011). In response, CHOI stated, "What we brought from Boston is 169,710." (CHOI was explaining that she had retrieved $169,710 from the trip on November 8, 2011). PARK then asked, "When was that?" In response, CHOI stated, "Didn't write down the date." CHOI later stated, "$150 for baby sitting, $140 for gas, $60 for tolls..." (CHOI was explaining the expenses associated with the pick up of drug proceeds; expenses that she expected to be borne by the money broker working for the Moreno DTO).

28. On November 16, 2011, at approximately 12:38 p.m., CHOI received an incoming call over Target Facility #2 and spoke with PARK. During the ensuing conversation, CHOI stated "and the date I went to Boston, is the date I went to Boston is November 8th." (CHOI was explaining that she retrieved the $169,710 from Hernandez of the Moreno DTO on November 8, 2011). Accordingly, a money laundering ledger[1] retrieved from 522 Closter Dock Road contained an entry titled "Tina, Bo 2, 169 710, 180 Ningra, 140 gas, 60 Toll." (The ledger entry means the following: "Tina" is an alias used by CHOI and she retrieved the money; "Bo 2" means the second money pick up in Boston; 169 710 means $169,710; "180 Ningra" means $180 to the baby sitter; "140 gas" means $140 in gas expenses; and "60 Toll" means $60 in tolls as described in the telephone call on November 16, 2011 at 12:22 p.m.).

29. Based on my training and experience, and based on the pattern of activity used by the Moreno DTO, PARK and CHOI, I believe CHOI retrieved drug proceeds from Hernandez in order for CHOI to launder them. This view is based, in part, on the fact that: (a) CHOI drove about eight hours round-trip to make a brief pick up from Hernandez; (b) Hernandez is a known member of the Moreno DTO; (c) PARK had received a similar shipment of drug proceeds from Medina on August 18, 2011; (d) PARK and CHOI's recorded telephone conversations reveal the

---

[1] On or about December 14, 2011, law enforcement agents responded to a request for assistance at 522 Closter Dock Road. In an interview conducted in Spanish with law enforcement agents, PARK stated that an unidentified male knocked on the door to 522 Closter Dock Road. After PARK opened the door, he was assaulted by the unidentified male as he demanded that PARK give him money. During this time, another unidentified male searched 522 Closter Dock Road. PARK was injured, but he refused medical treatment. PARK also denied being involved in any illegal activity. Pursuant to a consent search of 522 Closter Dock Road, law enforcement agents discovered several suitcases and duffel bags, money counters, a photocopier, and ledgers. Law enforcement agents photocopied a few pages from a ledger that had entries for the name "Julio." According to a confidential witness, who has proven credible and reliable in the past, Julio LNU is a money broker located in Mexico who participates in the organizing and transferring of drug proceeds through money laundering agents. Title 3 interceptions reveal that Julio LNU works closely with PARK and CHOI to facilitate the laundering of drug proceeds on behalf of the Moreno DTO and other drug trafficking organizations.

amount of money retrieved; and (e) a drug ledger located at 522 Closter Dock Road contained an entry memorializing CHOI's transaction with Hernandez in Massachusetts.

### TRANSACTION #3

A.  *On November 9, 2011, CHOI retrieved $424,575 in drug proceeds in Maryland*

30.    On November 9, 2011, at approximately 8:38 a.m., law enforcement agents conducting surveillance, observed CHOI and an unknown female exit 522 Closter Dock Road and enter the 2011 Lexus GX. CHOI and the unknown female traveled southbound on the New Jersey Turnpike to the vicinity of Baltimore, Maryland.

31.    At approximately 10:03 a.m., the 2011 Lexus GX exited the New Jersey Turnpike and stopped at the Molly Pitcher rest stop in Cranbury, New Jersey. Agents observed CHOI placing fuel in the 2011 Lexus GX. At approximately 10:15 a.m, CHOI exited the rest stop and traveled southbound on the New Jersey Turnpike. CHOI and the unknown female continued to travel southbound through Delaware and into Maryland.

32.    At approximately 7:27 p.m., law enforcement agents observed CHOI in the 2011 Lexus GX traveling northbound on the New Jersey Turnpike in the vicinity of Secaucus, New Jersey. CHOI and the unknown female arrived at 24 East Columbia Avenue, Palisade Park, New Jersey. Prior to her arrival, CHOI was observed squaring the block before stopping the vehicle. Squaring blocks is a common counter-surveillance technique.

33.    Shortly thereafter, CHOI was observed exiting the address while rolling a dark colored suitcase and carrying a black bag on her shoulder along with a purse. The unknown female was observed carrying a tan bag and a purse. Both CHOI and the unknown female placed the suitcase and the two bags into the rear cargo area of the 2011 Lexus GX and brought the purses to the front of the vehicle.

34.    After leaving 24 East Columbia Avenue, CHOI and the unknown female arrived at 522 Closter Dock Road. Both CHOI and the unknown female exited the 2011 Lexus GX, removed the two bags and the dark colored suitcase and entered the 522 Closter Dock Road.

35.    On November 16, 2011, at approximately 12:22 p.m., CHOI received an incoming call over Target Facility #2, a phone used by both PARK and CHOI, and spoke with PARK. During the ensuing conversation, which was recorded by law enforcement, CHOI stated, "Maryland 424575, 450 is for three days because for babysitting, 140 for gas, 70 toll, 200 hotel, and 229 champagne." In response, PARK asked, "What's 229?" CHOI replied, "champagne." PARK asked, "What's champagne?" In response, CHOI stated, "Just write like that, and he will know." (CHOI was explaining the false expenses associated with the pick up of $424,575 in drug proceeds in Maryland on November 9, 2011; expenses that she expected to be borne by the money broker working for the Moreno DTO).

35.    Accordingly, a money laundering ledger retrieved from 522 Closter Dock Road contained an entry titled "Tina, MARY, 424 575, 450, 140 gas, 70 Toll, 200 Hot, 229 Shampaigne [sic]." (The ledger entry means the following: "Tina" is an alias used by CHOI and she retrieved the money; "MARY" means a money pick up in Maryland; 424 575 means $424,575; "450" means $450 for the housekeeping services during her money pick ups; "140 gas" means $140 in gas expenses; "70 Toll" means $70 in tolls; "200 Hot" means $200 for a

hotel; and "229 Shampaign" means $229 for champagne as described in the telephone call on November 16, 2011 at 12:22 p.m.).

36.   Based on my training and experience, and based on the pattern of activity used by the Moreno DTO, PARK and CHOI, I believe CHOI retrieved drug proceeds from a coconspirator in order for CHOI to launder them. This view is based, in part, on the fact that: (a) CHOI drove several hours round-trip to make a short stay in Maryland; (b) PARK and CHOI have received a similar shipment of drug proceeds from Medina on August 18, 2011 and from Hernandez on November 9, 2011; (d) PARK and CHOI's recorded telephone conversations reveal the amount of money retrieved; and (d) a drug ledger located at 522 Closter Dock Road contained an entry memorializing CHOI's transaction in Maryland.

## TRANSACTION #4

A.   *On November 11, 2011: CHOI traveled to Pennsylvania to retrieve $595,000 in drug proceeds.*

36.   On or about November 11, 2011, CHOI exited 522 Closter Dock Road and entered the 2011 Lexus GX. CHOI traveled in the white Lexus with Target Facility #2, a cellular telephone used by PARK and CHOI, for a round trip visit Philadelphia and Allentown, Pennsylvania before returning to 522 Closter Dock Road. During the entire trip from 522 Closter Dock Road to and from Pennsylvania, CHOI used the Target Facility #2 to contact an unknown male ("UM0083") for the purpose of retrieving the drug proceeds. Each of the following conversations were lawfully recorded by law enforcement.

37.   At approximately 8:53 a.m., CHOI made an outgoing call over Target Facility #2 and spoke with an unidentified male ("UM0083"). During the ensuing conversation, CHOI informed UM0083 that she was ready to leave. UM0083, referring to CHOI as "Tina," stated, "...give me a few...I'm just waiting for them to arrive...they said that they will be here around 11:00... wait for me to call you and then you can come over...they are coming all the way from "the towers." (UM0083 was explaining that the coconspirators who were delivering the money were traveling a long distance).

38.   At approximately 11:26 a.m., CHOI placed an outgoing call over Target Facility #2 and spoke with UM0083. During the course of the conversation, CHOI stated "do you have the schedule...I want to leave...it will take me 3 and 30 hours." (CHOI was explaining that the trip from 522 Closter Dock Road to Philadelphia and Allentown, Pennsylvania would take her approximately three and one half hours travel time).

39.   At approximately 7:47 p.m., CHOI made an outgoing call over the Target Facility and spoke with Julio LNU. During the ensuing conversation, CHOI informed Julio LNU that she just met them and they told her "5-9-7." (Choi was explaining that she had picked up $597,000 in narcotics proceeds).

40.   On or about November 12, 2011 at 6:52 p.m. CHOI made an outgoing call over Target Facility #2 and spoke with Julio LNU. During the ensuing conversation, CHOI stated to Julio LNU, "5-9-5-4-60." Julio replied, "...Okay, that is what we were fighting about before because there was about 100 missing." (Choi was explaining that she had miscounted the amount of money from a prior conversation. The correct amount to be laundered was $595,460).

41.     On or about November 15, 2011 at 12:19 p.m, CHOI made an outgoing call over Target Facility #2 and spoke with Julio LNU. During the ensuing conversation, Julio LNU asked "... if someone called you for the boxes...I will tell them tomorrow to call you...Rafa also said that if you can do faster..." ("Rafa" is an alias used by PARK). CHOI replied "...today, I will give you 30. The other lady wants 100 is waiting for the dollar to go down to 12.90..." (Choi was using the word "boxes" as code for dollars and was discussing the monetary exchange of pesos and dollars). Julio LNU then stated "...I called Rafa and they are selling for 13.10 and 13.5... they are going to pick up the 595 and I have it ready to take out the 595 and they will talk to you, also they want to leave you 300..." In response, CHOI replied "...do you want me to pick it up again...I have the 595, all the expenses and what you have to pay me...last week 3 days including Phila..." (CHOI and Julio LNU were discussing the pick up $595,000 in drug proceeds and what expenses and compensation she was expecting from Julio LNU).

42.     Accordingly, a money laundering ledger retrieved from 522 Closter Dock Road contained an entry titled "Tina, Phila., 595 360, 3000 comic, 150 Ningra, 130 gas, 70 Toll, 30 lunch." (The ledger entry means the following: "Tina" is an alias used by CHOI and she retrieved the money; "Phila" means a money pick up in Philadelphia; "595 360" means $595,360; "3000 comic" is an unknown expense; "150 Ningra" means $150 for the babysitter during her money pick ups; "130 gas" means $130 in gas expenses; "70 Toll" means $70 in tolls; and "30 lunch" means $30 for lunch expenses during the money pick up).

B.     *PARK and CHOI subsequently conducted structured deposits into bank accounts*

43.     From November 10, 2011 through December 2, 2011, bank records reveal that deposits $213,111.78 were placed at New Jersey branches of Bank of America into account numbers 3810-2419-0301 in the name of Beads House, Inc. and 3810-2419-5102 in the name of CHOI and Chul Ho Kim.

44.     Of the $213,111.78, $144,790 were structured deposited in cash to avoid the legal reporting requirement.

45.     Based on my training and experience, and based on the pattern of activity used by the Moreno DTO, PARK and CHOI, I believe CHOI retrieved drug proceeds from a coconspirator in order for CHOI to launder them. This view is based, in part, on the fact that: (a) CHOI drove several hours round-trip to make a short stay in Philadelphia, Pennsylvania; (b) PARK and CHOI have received a similar shipment of drug proceeds from Medina on August 18, 2011, from Hernandez on November 9, 2011, and from UM0083 in Maryland; (c) CHOI's recorded telephone conversations with Julio LNU reveal the amount of money retrieved; (d) a drug ledger located at 522 Closter Dock Road contained an entry memorializing CHOI's transaction in Philadelphia, Pennsylvania; and (e) PARK and CHOI's structured cash deposits following the money pick-ups in Maryland and Philadelphia, Pennsylvania.

### TRANSACTION #5

A.     *On December 2, 2011, PARK and CHOI coordinate the delivery of $650,000 in drug proceeds to UC4 and UC5 to be laundered on behalf of Julio LNU*

46.     During the course of the investigation, CHOI was in contact with an undercover agent (hereinafter, "UC-4"), posing as a money broker in Los Angeles, California over Target Facility #1 for the purpose of laundering drug proceeds. In a series of recorded conversations over the Target Facility #1, UC-4 arranged to travel to New Jersey to introduce an undercover

agent (hereinafter, "UC-5"), posing as someone who would assist CHOI and PARK in laundering drug proceeds.

47. On or about December 1, 2011, at 4:31 p.m., PARK made an outgoing call over Target Facility #1 and spoke with UC-4. During the ensuing conversation, UC-4 advised PARK that UC-4 and UC-5 were inside the lobby of a hotel in East Rutherford, New Jersey.

48. At approximately 4:33 p.m., UC-4 and UC-5 met with PARK inside the hotel lobby. UC-4, while wearing a recording device, stated, in substance and in part, that UC-4 was sorry to make PARK come out for this meeting. UC-4 then explained to PARK that UC-4 preferred to meet with new clients first before doing business. UC-4 also explained to PARK that UC-4 likes to see that "everything is alright." (UC-4 was explaining that UC-4 wanted to be comfortable with PARK before UC-4 would conduct a money laundering transaction with PARK). PARK agreed with UC-4.

49. UC-4 then stated that UC-4 had spoken with "Tina" (that is, CHOI) last week. UC-4 stated that "Tina" asked if UC-4 was the "one that sells the merchandise to them." (CHOI was asking whether UC-4 was selling narcotics for the drug cartels). UC-4 explained that UC-4 was not, and that UC-4 only handles the money end of the business. UC-4 stated, in substance and in part, that he "didn't like having the kilos close to the money." UC-4 then stated "what I want to know is that you don't have any of that in your house...because you know, when it's about, about product the, the people here, the authorities are more..." (UC-4 was asking if PARK had both money and drugs stored in his house). In response, PARK replied, "No, no, I don't." PARK stated that he was only doing a favor that there was a "misunderstanding" between UC-4 and "Tina." UC-4 then explained that UC-5 knew people who can get "the merchandise" if PARK needed it.

50. UC-4 then stated that UC-5 is "the guy who will be taking care" of PARK. (UC-4 was explaining that UC-5 would be PARK's direct contact for money laundering with UC-4). UC-4 instructed PARK to give his telephone number to UC-5. UC-4 explained that if there was any future business, which depended upon the owners of the money, PARK would deal directly with UC-5, who would be in charge of UC-4's business in New Jersey.

51. UC-4 then asked PARK when PARK wanted to do the exchange. (UC-4 was asking PARK when PARK wanted to provide the money to UC-5). PARK then asked UC-5 if UC-5 would be able to do the exchange in the morning. UC-5 stated that tomorrow would not be a problem.

52. UC-5 then asked PARK if he had counted the "shirts." (UC-5 was using "shirts" as a code word for money). PARK stated, in substance and in part, that it was "six hundred and fifty boxes." (PARK was using "boxes" as a code word for dollars). PARK then stated that "there were 2 luggages", evenly split between the two bags.

53. UC-5 and PARK then agreed to meet at the Linwood Plaza in Fort Lee, New Jersey at a time between 8:30 a.m. and 9:00 a.m. PARK stated "it's a lot of boxes to be counting...I personally counted it." (PARK was explaining that he personally counted the $650,000). PARK stated, in substance and in part, that the count might be off by "20" or "40," and that "I am a person; I could make mistake." PARK then stated that he was available between 8:30 a.m. and 10:30 a.m. and that after that time, he had "another job." (PARK was explaining that he had another pick up or delivery of drug proceeds to conduct after 10:30 a.m.).

54.     PARK provided UC-5 with the telephone number for Target Facility #1. UC-5 then placed an outgoing call to Target Facility #1 so that PARK could capture UC-5's cellular telephone number. PARK advised UC-5 to arrive fifteen minutes prior to UC-5's arrival at Linwood Plaza. UC-5 agreed to call prior to his arrival at the meet location.

55.     On or about December 2, 2011, at approximately 8:34 a.m., UC-5 placed an outgoing call to Target Facility #1 and spoke with PARK. During the ensuing conversation, UC-5 stated that UC-5 was about twenty minutes away from Linwood Plaza. In response, PARK replied that he would meet UC-5 at Linwood Plaza at between 10:15 a.m. and 10:30 a.m.

56.     At approximately 9:50 a.m., UC-5 placed an outgoing call to Target Facility #1 and spoke with PARK. During the ensuing conversation, UC-5 and PARK agreed to meet at a diner located at Linwood Plaza.

57.     At approximately 10:10 a.m., UC-5 placed an outgoing call to Target Facility #1 and spoke with PARK. During the ensuing conversation, UC-5 stated that UC-5's vehicle was parked near the H-Mart sign in Linwood Plaza. In response, PARK stated that he was approximately five minutes away from Linwood Plaza.

58.     At approximately 10:15 a.m., UC-5 received an incoming call from Target Facility #1 and spoke with PARK. During the ensuing conversation, UC-5 stated that UC-5 was "coming back from CVS. Can you go to? I am by the sign that says Bank of America." In response, PARK replied, in substance and in part, that "there are too many cops there. So come over here." (PARK was requesting that UC-5 and he meet near the H-Mart sign and AT&T store in Linwood Plaza where he was parked). As a result, UC-5 then entered his vehicle and drove it closer to the H-Mart.

59.     At approximately 10:18 a.m., UC-5 placed an outgoing to Target Facility #1 and spoke with PARK. During the ensuing conversation, UC-5 asked PARK what was the color of the vehicle that PARK was driving. A few moments later, UC-5 and law enforcement agents conducting surveillance observed PARK standing next to the white 2011 Lexus GX. (Law enforcement agents have observed this same vehicle being used by CHOI during previous surveillance).

60.     After parking the vehicle next to the white Lexus GX, UC-5 exited the vehicle and PARK asked, "how are you"? In response, UC-5 stated that "everything was good." At the same time, PARK opened the tailgate of the white Lexus and removed one black duffel bag. PARK stated, in substance in part, that "one of the three and three-fifty." (PARK was explaining that one bag contained $300,000 and a different bag contained $350,000 in drug proceeds). UC-5 placed the duffel bag into the hatch of UC-5's vehicle. PARK next handed UC-5 a second black duffel bag, which UC-5 placed into the hatch of UC-5's vehicle. UC-5 then shook the hand of PARK and stated that PARK had UC-5's telephone number if PARK needed anything. UC-5 departed Linwood Plaza in the vehicle containing the two duffel bags provided by PARK.

61.     Law enforcement agents opened the two black duffel bags and found them to contain an undetermined amount of U.S. currency. One of the duffel bags contained 30 bundles, which were bound with numerous rubber bands. The second duffel bag contained 38 bundles, which were bound with numerous rubber bands.

62.     Based on my training and experience, and based on the pattern of activity used by the Moreno DTO, PARK and CHOI, I believe that PARK and CHOI delivered drug proceeds to

UC-5 for the purpose of UC-5 laundering them on behalf of Julio LNU. This view is based, in part, on the fact that: (a) On December 1, 2011, UC-4 and UC-5 met with PARK for the purpose of facilitating a pick up of $650,000 in drug proceeds to be delivered to Julio LNU's associates in California; (b). PARK provided UC-5 with the telephone number for Target Facility #1; and (c) on December 2, 2011, after a series of telephone conversations over Target Facility #1, UC-5 met with PARK and retrieved from him two duffel bags containing approximately $650,000.

## TRANSACTION #6

A.  *On February 14, 2012, PARK retrieved approximately $147,620 in drug proceeds from Jose Rosario and Jose Antonio Velasquez on behalf of Christina LNU*

63. On February 14, 2012, at approximately 10:04 a.m, PARK placed an outgoing call over Target Facility #3, a cellular telephone used by PARK and CHOI, and spoke with Christina LNU. During the ensuing conversation, Christina LNU stated, "I was calling to tell you that I will give you something, and I will give your number to the guy." (Christina LNU was explaining that she had drug proceeds to give to PARK). In response, PARK stated, "ahhh....they have something?" Christina LNU replied, "yes, 150 boxes." (Christina LNU was using the code word "boxes" to mean $150,000). Christina LNU later stated, "then since they know you, they want to do it again." In response, Park stated, "Ok. It will be the same guy?" Christina LNU then stated, "Yes. So, I'll give them your number so they can call you or radio you."

64. At approximately 10:07 a.m, PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, PARK stated "the girl call me to give me the money. Is Christina the same girl?" PARK further stated, "She radioed me and she said is ready and she was telling me that didn't you guys want $150,000 and your number starts with 551 so I said that's right, but I didn't know about this so I said I will talk to you first." In response, CHOI stated, "Is right. Just get it." (CHOI was instructing Park to retrieve the money from Christina LNU).

65. At approximately 10:08 a.m, PARK received an incoming call over Target Facility #3 from 52*131027*232 and spoke with Christina LNU. During the ensuing conversation, PARK stated "Yes. This is Rafa. So is all good. Is for today?" In response, Christina LNU stated, "Yes. Today, and like the last time. Let me know when you get it and everything and Jorge will be in charge about the payment." (Christina LNU was explaining that they will organize the pick up of money in the same way that occurred on February 3, 2012, as confirmed by wire communications intercepted, and that coconspirator Jorge Molina would pay the commission for PARK's services. On February 3, 2012, intercepted communications revealed that PARK retrieved $134,350 on behalf of Christina LNU).

66. At approximately 10:36 a.m, PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, CHOI asked, "When are you meeting them?" In response, PARK stated, "She told them and they said ok, but she told me he will try for this morning. But worse case tomorrow morning 100%. So, I said I don't want to do it at night, and she said she will let me know or the guy will call me." In response, CHOI stated, "Try today, if you can...we need to make money." (CHOI was instructing PARK to make the pick up of money from Christina LNU's associate so that he could be paid his commission).

67.     At approximately 10:58 a.m, PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, CHOI asked, "they will call you?" In response, PARK stated, "yes they will call me." (Choi was verifying that PARK was to await a call from the associate of Christina LNU).

68.     At approximately 3:41 p.m., PARK received an incoming call from (347) 496-4530 to (551) 497-0759. The telephone number (551) 497-0759 is used by and subscribed to by PARK. Just four minutes later, at approximately 3:45 p.m, PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, PARK stated "they just called me and they said come to Elizabeth." (PARK was explaining that Christina LNU's associate had contacted him and that he was to travel to Elizabeth, New Jersey to retrieve the $150,000). Shortly thereafter, toll records reveal that, at approximately 3:52 p.m., PARK received an incoming call from (347) 496-4530, a phone number used by Jose Antonio Velazquez, to (551) 497-0759, and at approximately 3:58 p.m., PARK placed an outgoing call to (347) 496-4530 from the (551) 497-0759 telephone number.

69.     At approximately 4:01 p.m, PARK received an incoming call over Target Facility #3 and spoke with Christina LNU. During the ensuing conversation, PARK asked, "Yes. They talked to me already. They are another person, right?" (PARK was explaining that he had just spoken to a money laundering associate). In response, Christina LNU stated, "Yes. But it is the same. They are taking long because they had, it's just that I had more boxes over there, but I am only going to give you the 150, that was what Jorge told me. So, they are separating it. That's why it's running late a bit." (Christina LNU was explaining that the same money laundering associate and associates were counting and separating a lot of money, and that they were running late in providing PARK with the $150,000 to be laundered). PARK replied, " Okay...it's about an hour from here." (PARK was explaining the approximate distance from his location to Elizabeth, New Jersey).

70.     At approximately 5:09 p.m, PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, CHOI asked, "Are you driving your way there?" In response, PARK stated, "Yeah. I'm almost there." CHOI asked, "Did you go alone?" In response, PARK stated, "No. I came with baby. Hang up. Hang up." (PARK was explaining that he was traveling with their child as a cover should he be stopped or questioned by law enforcement).

71.     At approximately 5:14 p.m., law enforcement officers conducting surveillance observed a 2012 Ford Taurus, driven by Jose Rosario[2] and Jose Antonio Velazquez park directly across the street from Park on Glen Zamorski Drive in Elizabeth, New Jersey. Jose Antonio Velazquez exited the 2012 Ford Taurus and removed a red duffle bag from the trunk and handed it to PARK. PARK then quickly placed the red duffle bag in his trunk. PARK and Jose Antonio Velazquez entered their respective vehicles and drove away from the meeting location. (Law enforcement believes that Jose Antonio Velezquez and Jose Rosario had just provided PARK with $147,620 in drug proceeds).

---

[2] On December 29, 2011, law enforcement seized approximately $335,170 in drug proceeds from Jose Rosario and Alberto Gaxiola-Acosta. On April 3, 2012, Jose Rosario was arrested in possession of approximately 7 kilograms of heroin and charged with conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin.

72. At approximately 5:25 p.m, PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, PARK stated, "I've picked up the money and going home now." In response, CHOI stated, "Alright. Be safe. Is the baby behaving"? (CHOI was confirming the pick up $147,620 from Christina LNU's associate).

73. At approximately 5:43 p.m, PARK received an incoming call over Target Facility #3 and spoke with Jenny Park, the daughter of PARK and CHOI. During the ensuing conversation, Jenny Park asked, "Where are you coming from?" In response, PARK stated, "I'm coming from Elizabeth. Hey. There are a lot of police. So, hang up."

74. On February 16, 2012, at approximately 1:11 p.m., PARK received an incoming call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, PARK and CHOI discussed the pick up of money on behalf of Jorge LNU and Christina LNU. In particular, CHOI asked, "...when you went to get it, how were the people?" In response, PARK stated, "100% drug dealers." CHOI then asked, "Really?" In response, PARK stated, "Yes. And the kids were nice, but I can tell they do drugs." (PARK was describing the appearance and trade of associates Jose Antonio Valezquez and Jose Rosario from the drug proceeds pick up on February 14, 2012).

75. At approximately 9:01 p.m., PARK made an outgoing call over Target Facility #3 and spoke with CHOI. During the ensuing conversation, PARK asked "Ahh. Then is Julio something.. the boss? Otherwise, there is someone who out-ranks him, right?" In response, CHOI stated, "He is almost on top...but not the highest...but still quite high." (CHOI was explaining that Julio LNU was a high-level member of the Mexican Sinoloa drug cartel). PARK then asked, "He does money...but drugs...drugs...he doesn't seem to do drugs, does he?" (PARK was asking whether Julio LNU was only a money broker for the drug cartels or whether he also conducted illicit drug trafficking). In response, CHOI stated, "[He] does." PARK stated, "Ahh. Is that so?" In response, CHOI stated, "Mostly what they do is...in the middle...take care of that delivery...what is given to us in the U.S."

76. Based on my training and experience, and based on the pattern of activity used by PARK and CHOI, I believe that PARK and CHOI retrieved drug proceeds to be laundered on behalf of Jorge LNU and Christina LNU. This view is based, in part, on the fact that: (a) PARK drove to Elizabeth, New Jersey for the purpose or retrieving bulk currency; (b) during the trip and in recorded conversations after the trip, PARK used his child as cover and worried about being stopped by law enforcement while carrying bulk currency; (c) PARK stated to CHOI that he believed the people with whom he had retrieved the money were "drug dealers" and that Julio LNU was a high-level of member of a drug trafficking cartel.

**TRANSACTION #7**

A. *From May 4, 2012 through May 12, 2012, PARK, CHOI and Others discussed over the Target Facility #1 and Target Facility #2 the retrieval and subsequent law enforcement seizure of $200,000 in drug proceeds*

77. Law enforcement surveillance and intercepted communications over the Target Facility #1 revealed that CHOI traveled round trip from 522 Closter Dock Road to Boston, Massachusetts to retrieve approximately $200,000 in drug proceeds. Law enforcement conducted a traffic stop of CHOI and Heung Yeol Kim and seized the $200,000. CHOI proceeded to discuss the seizure over the Choi Facility and Target Facility #1.

78. On May 4, 2012, at 10:33 a.m., CHOI placed an outgoing call over Target Facility #1 and spoke with Mok Y. Chung, a/k/a "Hello Kitty." During the ensuing conversation, CHOI asked, "...when are you going to Boston..." In response, Chung replied, "...next week...Monday..." CHOI then asked "...can you trust the person who works there...can I leave my stuff there...money...my client is there that is why...do you have the address...can you text me..." Chung replied " I will do that ...yes..." (CHOI was asking if she can have someone drop money to Chung's friend in Boston for safe keeping).

79. On May 8, 2012, at 1:46 p.m., CHOI received a call over Target Facility #1 from and spoke with Heung Yeol Kim, a/k/a "Abercrombie." During the ensuing conversation CHOI asked "... you called because of that right..." In response, Kim stated, "...just in case that's why..." CHOI replied "...I am going crazy too. I need money too. I am talking to him so I'll call you soon..." (CHOI was explaining that she may be retrieving money to be laundered soon and will let Kim know if she needs his assistance).

80. At approximately 1:49 p.m, CHOI placed a call over Target Facility #1 and spoke with Kim. During the ensuing conversation CHOI stated, "...I have just spoken to him and he says he will give me by today or tomorrow surely...I will give you a call as soon as I get it. I am in a rush too, because I don't have any money now..." (CHOI and Kim were discussing that they were waiting for CHOI to receive bulk currency from Julio LNU to facilitate their money laundering activities).

81. On the morning of May 10, 2012, law enforcement observed Kim arrive in a black Lexus sedan at 522 Closter Dock Road. Shortly thereafter, CHOI exited 522 Closter Dock Road and entered the black Lexus sedan driven by Kim. Shortly thereafter, CHOI and Kim departed the area of 522 Closter Dock Road.

82. At approximately 2:26 p.m., law enforcement surveillance revealed that the black Lexus sedan arrived at an H-Mart supermarket located at 3 Old Concord Road, Burlington, Massachusetts. Approximately two minutes later, the black Lexus left the area and drove to a delicatessen. At approximately 3:20 p.m., law enforcement observed CHOI and Kim exit the delicatessen and enter the black Lexus sedan and return to the H-Mart. At approximately 3:27 p.m., CHOI took a shopping cart from the entrance area and began to walk through the parking lot with the shopping cart. A white male, later identified as John Schrimpf then walked up to CHOI in the parking lot carrying a cardboard box. Shrimpf then placed the box into CHOI's shopping cart and then walked away. CHOI then walked towards the black Lexus sedan. Subsequently, CHOI placed the box into the trunk of the black Lexus. CHOI and Kim then left the area in the black Lexus.

83. At approximately 4:02 p.m., law enforcement conducted a traffic stop of the black Lexus sedan. At this time, Kim appeared very nervous and provided consent for law enforcement to search the vehicle. Law enforcement's K-9 unit alerted to the box that CHOI had placed in the trunk of the vehicle. Inside the box, law enforcement discovered a large amount of U.S. currency, later determined to be approximately $200,000.

84. At approximately 5:12 p.m., in call 3679, CHOI placed an outgoing call over Target Facility #2 and spoke with PARK. During the ensuing conversation, CHOI stated, "...if you see an email...with Julio's name, erase everything...." (After CHOI was stopped by law enforcement, who seized $200,000 from her possession, she placed this call to PARK instructing him to delete all emails associated with Julio LNU, the money broker on whose behalf she was transporting the $200,000).

85. At approximately 8:46 p.m., CHOI placed a call over Target Facility #1 and spoke with Sarah Park. During the ensuing conversation, CHOI stated, "...go into dad's email...check on the deleted emails...what's there..." In response, Sarah stated, "...Bank of America, Citi...Mark Adams, Hotel.com, Julio Dominguez..." CHOI then interrupted, "...that's the one...Julio Dominguez...open that email...there is a phone number...what is it?" In response, Sarah Park relayed, "508-202-3690." (CHOI was asking Sarah Park to look up the phone number of a conspirator who provided CHOI with $200,000 to be laundered).

86. On May 11, 2012, at 12:29 p.m., CHOI received an incoming call over the Target Facility #1 spoke with FNU Lim. During the ensuing conversation CHOI stated, "...you know I told you...yesterday...I went to pick up money...police catch up...big problem...now I am at a law office...." (CHOI was explaining that she was stopped by police and was about to speak to a lawyer).

87. On May 12, 2012, at 12:45 p.m., CHOI placed a call over Target Facility #2 and spoke with Julio LNU. During the ensuing conversation, CHOI stated, "...Julio, the deposit that came in...it was 50...I told you 100..." Julio replied, "...let me tell him/her...it would be...Monday because they won't do anything today...but I have the other ones to send you...." CHOI replied, "...I entrust you and you can go to Rafa..." Julio LNU then asked, "...can he come today...now..." CHOI then asked, "...did the same thing that happened to her, happen to one of his acquaintances..." Julio LNU stated, "he knows of other people but not to him...in fact, he is locked up but because he had the boxes in a hiding place in the car...." (CHOI and Julio LNU were discussing $100,000 that Julio LNU was wiring to Hong Kong on behalf of CHOI and CHOI. They also discuss the seizure of $200,000 that CHOI had picked up on Julio LNU's behalf).

88. On May 15, 2012, at 2:11 p.m., CHOI placed an outgoing call over Target Facility and spoke with Mok Y. Chung, a/k/a "Hello Kitty." During the ensuing conversation, CHOI stated "...I was going to Boston and they took my money because I was caught by the police...I will go tomorrow or day after...and give you the money and the paper..." In response, Hello Kitty asked, "...tell me about how did it happen..." CHOI replied, "...the police stopped me and I went with the Abercrombie guy...but he doesn't have a green card...." Hello Kitty stated, "...he is an international student...and some is attending school under his name...he doesn't speak a word of English...." CHOI continued, "...I said that the box was mine but the police opened without asking me..." (CHOI was explaining that she had been stopped by police with Heung Yeol Kim while carrying the $200,000 in suspected drug proceeds and that police seized the box containing the $200,000). The conversation continued with CHOI advising Chung about cash swap transactions, exchanges rates and/or commissions.

89. At approximately 2:34 p.m., CHOI received an incoming call over the Target Facility #2 and spoke with Julio LNU. During the ensuing conversation, CHOI asked, "...how much can you transfer to me..." Julio LNU replied, "...the amount that you need..." CHOI then stated, "...I need $150,000...."

90. On May 16, 2012, at 2:38 p.m., CHOI received an incoming call over the Target Facility #2 and spoke with Julio LNU. During the ensuing conversation, Julio LNU stated, "...Listen...I will be going again with the man of the boxes from there...with the other partner...when can you have the...details as to why they searched you...when will he (the lawyer) have it ready for you..." CHOI replied, "...the letter that I sent you are receipts from the police...one is a receipt from the police the other is from the lawyer...you can show them how

17

many boxes were confiscated..." Julio LNU replied, "...they want the motive for which...they stopped you...they want to know if it was their fault...they are charging me here...and you cannot give it to me till you get them back...I need to give them some explanation...." CHOI replied, "...ok thanks and check about that $200,000." (CHOI and Julio LNU were discussing the seizure of $200,000 that CHOI had picked up on Julio LNU's behalf.)

91.     On May 17, 2012, at 2:19 p.m., CHOI placed an outgoing call over the Target Facility #2 and spoke with Julio LNU. During the ensuing conversation, CHOI asked, "...I sent you an email...the information of the bank for Korea...did you ask about the 20 boxes?" In response, Julio LNU stated, "...let me check because for 20 boxes you can go right..." CHOI replied, "yes, I will go for that with a friend so each of us can hold 10...you know since I know is legal I would go during the weekend...." Julio LNU replied, "...you should know...they might go to you...that is why let me ask and I will let you know..." CHOI stated, "...tell them not to take the highway, tell them to take a bus or subway...they don't check there...." (CHOI was explaining that Julio LNU should send future couriers by bus or subway instead of by passenger vehicle, as they are less likely to be intercepted by law enforcement on a bus or subway).

### ADDITIONAL STRUCTURING AND MONEY LAUNDERING ACTIVITY

92.     As stated above, PARK and CHOI maintain four bank accounts at Bank of America used primarily for structuring and money laundering activities. They maintain account numbers 3810-2419-0301 and 3810-2419-0291 in the name of Beads House, Inc. They also maintain account numbers 3810-2419-5092 and 3810-2419-5102 in the name of Jong PARK and in the names of Jung CHOI and Chul Ho Kim respectively.

93.     PARK and CHOI maintain four bank accounts at J.P. Morgan Chase used primarily for structuring and money laundering activities. They maintain account numbers 735063273 and 799716253 in the names of Beads and Jewelry Int'l Corp and Beads House, Inc. respectively. They also maintain account numbers 8850458031 and 880099395 in the name of Jong PARK and Jung CHOI respectively.

94.     The investigation has revealed that from January 7, 2010 through April 4, 2012, PARK, CHOI, and other coconspirators structured cash deposits, totaling approximately $2,466,955 into the bank accounts noted above. Most of these cash deposits were made in New Jersey, Illinois, Texas, and Georgia.

95.     Based on my training and experience, the intercepted communications of PARK and CHOI, evidence obtained from bank records, and the pattern of activity used by PARK and CHOI, I believe that they have retrieved or delivered approximately $4,164,744.37 in drug proceeds in the form of bulk currency to be laundered. Moreover, PARK, CHOI, and other coconspirators have conducted structured cash deposits of approximately $2,466,955 during the course of the conspiracy.